# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 9, 2013

## STATE OF TENNESSEE v. TERRANCE LEWIS

**Appeal from the Criminal Court for Shelby County**
**No. 0806536    Chris Craft, Judge**

---

**No. W2012-00723-CCA-MR3-CD  - Filed August 9, 2013**

---

Terrance Lewis ("the Defendant") was convicted by a jury of one count of second degree murder, two counts of attempted second degree murder, and three counts of attempted voluntary manslaughter. Following a sentencing hearing, the trial court imposed an effective sentence of ninety-five years. In this appeal, the Defendant contends that the evidence is not sufficient to support his convictions and that the trial court erred in sentencing him. After a thorough review of the record and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which John Everett Williams, J., joined. D. Kelly Thomas, Jr., J., filed a concurring opinion.

Juni Ganguli, Memphis, Tennessee, for the appellant, Terrance Lewis.

Robert E. Cooper, Jr., Attorney General & Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Amanda Dwyer and Stephanie Johnson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

A Shelby County Grand Jury indicted the Defendant in September 2008 on one count of first degree murder involving victim Terrance Harris[1] and six counts of attempted first

---

[1] Terrance Harris' first name is spelled both "Terrance" and "Terrence" throughout the transcript.
(continued...)

degree murder involving victims Latesha Harris (count two), Carolyn Williams (count three), Damarius Harris[2] (count four), Takeisha Mears (count five), Erma Grice (count six), and Roger Boyd (count seven). Those charges arose out of a shooting which occurred on July 4, 2007, at Parkway Commons, an apartment complex in Shelby County, Tennessee. The Defendant proceeded to a jury trial on the indicted offenses on December 13-17, 2011, and the following proof was adduced:

Latarsha Harris[3] testified that victim Terrance was her younger brother. She stated that she and the Defendant both lived at Parkway Commons in July 2007. At approximately 4:00 p.m. on July 4, 2007, she saw Sedric Graves, the Defendant's friend, with the Defendant "[s]hooting guns up in the air." She did not know what type of guns they were shooting, and she did not report this activity to the police.

As darkness approached, the Defendant, Rashada Omar (his sister), and Carlos Lewis (his brother) confronted Latarsha "about some fireworks" while she was standing in front of her apartment. A lot of children were outside at that time, including hers, as well as other adults. The children were in front of her apartment shooting fireworks. The Defendant "really didn't say anything" at that time. Rashada "was the one doing the talking," and she made "threats to harm" Latarsha's son, Darron Catron. According to Latarsha, Rashada "kept replying she was going to whip [Darron's] ass." Latarsha told Rashada that she was not going to let her do anything to hurt her son, but that she could tell her what her son had done. The Defendant then told Rashada, "[F]orget all of this, . . . you know [you] can hit one of these whores if you want to." Latarsha told her daughter, Otissa Pickens, "to go and call somebody." An older lady who was standing outside let Otissa use her phone. Latarsha was very upset and felt threatened during this initial confrontation which lasted approximately fifteen to twenty minutes.

When the confrontation ended, the Defendant, Rashada, and Carlos walked back towards Rashada's apartment. Victim Terrance and his girlfriend, Kendra McMullen, pulled into the parking lot after the confrontation. Latesha Harris (Latarsha's sister), Roger Boyd (Latesha's fiancé at the time), and their children also pulled into the parking lot after the

---

[1](...continued)
We will defer to the former spelling "Terrance" because that is the spelling used in the indictment.

[2] Damarius Harris' first name is spelled "Damarius" in the indictment but "Demarius" in the transcript. We will defer to the spelling used in the indictment.

[3] Because several of the witnesses share the same last name, we will refer to all civilian witnesses using their first names. We intend no disrespect. However, we will refer to Terrance Harris as "victim Terrance" since his first name and the Defendant's are the same.

confrontation. Latarsha had not called them and at the time did not know whether Otissa had.

The Defendant approached victim Terrance, who was sitting on the hood of Kendra's car. Latarsha stated that the Defendant "just stood there in front of [victim Terrance] and didn't exchange words, at all, with [victim Terrance]." She could "tell at that point" that the Defendant was armed. However, when he had confronted her earlier, he did not appear to be armed. Victim Terrance then looked up at the Defendant and said, "What's up Dirty?"[4] She stated that the Defendant replied, "You know what's up with me, it's gangster with me nigger, and you know my sister can hit one of these ho's if she wants to." She heard victim Terrance say, "Oh, it's like that Dirty. . . . We go way back." She stated that victim Terrance did not threaten the Defendant that night. She also was not aware of any prior trouble between the two of them.

Latarsha stated that she had made "preparations to leave" the premises with her family to "defuse the situation" after her verbal confrontation. As they were preparing to leave, Rashada walked back across the street towards Kendra's car with her boyfriend and Carlos. Rashada and Kendra first started "passing words," and then "they met up and they started fighting." During the fight, Kendra's shirt got torn off, but Latarsha did not see any injuries on Rashada. She did not see victim Terrance break up the fight and believed that it "just stopped."

After the fight ended, Latarsha then observed the Defendant "come from behind the garbage dump with the gun in his hand," and she screamed victim Terrance's nickname, "Big T." Latarsha was standing with Otissa right in front of victim Terrance at that time. She then saw the Defendant shoot victim Terrance. After she saw the first shot, she and Otissa ran away from the Defendant. She heard additional gunshots as she was running. She stated that victim Terrance did not have a gun.

Latarsha then ran to Roger and Latesha's vehicle because she saw victim Terrance "struggling to get in [it]." After getting victim Terrance inside of it, Roger drove victim Terrance to the hospital. She was escorted to the police department that night to give a formal statement and to view a photographic lineup. She identified a photographic lineup at the trial on which she had circled the Defendant's picture as the person who shot victim Terrance.

On cross-examination, Latarsha acknowledged that she "used to hang out" with the Defendant, that he had been to her apartment, and that they had "smoked weed" together. Latarsha did not call the Memphis Police Department ("MPD") or 911 that evening because,

---

[4] Latarsha testified that the Defendant's nickname was "Dirty." Several other witnesses also testified to this nickname.

after her verbal confrontation, Rashada, the Defendant, and Carlos "were leaving and [she] thought the situation was defused and [she] didn't think anything else was going to happen."

No words were exchanged between the Defendant and victim Terrance as the Defendant walked towards victim Terrance. She could not recall how close the Defendant was to victim Terrance when he fired the first shot, but she stated that he was close enough for her to see his face. She could not discern whether the additional gunshots that she heard as she was running sounded like they were from the same gun or different guns.

Kendra McMullen testified that in July 2007 she was dating victim Terrance. On July 4, 2007, Kendra was with victim Terrance the entire day. Kendra and victim Terrance eventually went back to Kendra's dorm room at the University of Memphis at approximately 9:00 p.m.

Kendra was getting ready to go to bed when Otissa called her phone at 9:05 p.m. Otissa sounded scared, "like she was afraid of something," and she wanted to talk to victim Terrance right away. After victim Terrance spoke to Otissa, he hung up the phone and ran out of the door to Kendra's car. Kendra followed him. Victim Terrance told Kendra that "something was going on with his sister and he had to go see what was going on." Victim Terrance drove her car, and it took them approximately fifteen minutes to get to Parkway Commons.

When they got to the apartment complex, they got out and sat down on the hood of Kendra's car. Latarsha was standing in front of them attempting to explain what had happened earlier. While they were talking, the Defendant was standing right beside Latarsha on his cell phone. Latarsha "was nervous," and she was acting "like she was afraid" and "kind of upset." The Defendant then hung up his cell phone, and victim Terrance asked him "what was going on between him and his sister." The Defendant then "kind of got a little hostile, . . . like, he was upset." Kendra recalled the following:

> He was saying that he was going to kill the whole family and all that and he would come back and shoot up the neighborhood. And that is when I said something, I said, so you're just going to come back and just shoot up the neighborhood with kids outside, you know, and he kind of got mad about that. And you know, I was talking smart to him, myself, something like, there's kids out here, so you just want to shoot up the neighborhood.

She also stated that the Defendant said to her, "[Y]ou're just a local b***h, I can find you." The Defendant then walked away toward Rashada's apartment.

-4-

Kendra was not aware of any prior "problems" between Latarsha and the Defendant or victim Terrance and the Defendant. After the Defendant walked away, she and Rashada subsequently began arguing. Kendra stated that Rashada was "kind of . . . walking up towards [Latarsha] . . . and [Latarsha] was trying to meet her half-way so they could fight."

Kendra testified that she was "kind of stepping in between" them. She denied that she threatened Rashada and instead stated that Rashada threatened her. Rashada then "tried to swing" at Latarsha but hit Kendra instead. Kendra stated, "[I]t just ticked me off and we got to fighting." The fight did not last long – at most five to ten minutes. Victim Terrance "grabbed [Kendra] by the arm" to break up the fight. He told her to go upstairs to put on a shirt because Rashada had torn off her shirt during the fight. Kendra agreed that she was "on the losing end of that fight[.]" She did not see the Defendant during this altercation. Other than some scratches and a torn-off shirt, Kendra did not receive any other injuries during the fight. She believed that Rashada probably had some scratches on her as well and that she knew that she pulled Rashada's hair.

Kendra never made it to Latarsha's apartment, because as she was walking in that direction, she heard gunshots. She turned around and saw the Defendant "shooting in the crowd." She then heard Latesha say that victim Terrance had been shot, so she ran towards him. Victim Terrance was leaning on Latesha's vehicle. Kendra stated, "We had to kind of push him into the truck in order to get him" inside of it. They still did not get him all the way in, so Roger drove with the door open with him "hanging half-way out of the truck" to Methodist South Hospital in White Haven.

Kendra did not know where victim Terrance had been shot, but she knew that he had been shot because "[b]lood was everywhere." He "couldn't talk, he didn't say nothing." She believed that she was at Methodist South for at least one to two hours before eventually going to the Regional Medical Center ("the MED") where Victim Terrance was "air-lift[ed]" to from Methodist South. At the MED, she was told that victim Terrance had died.

Kendra denied that victim Terrance had a gun that night or that he even owned a gun. She also did not see victim Terrance threaten the Defendant in any way that night.

On cross-examination, Kendra acknowledged that victim Terrance "smoked some weed" at his dad's house around 8:00 a.m. that morning and again around 3:00 p.m. with his sister. She also acknowledged that she never gave a formal statement to police in this case but stated that she did not do so because no one asked her to give a statement. She only spoke to a police officer at Methodist South. She also believed that a detective came by victim Terrance's grandfather's house sometime after the shooting, and she talked to him there.

Latesha Harris Boyd[5] testified that victim Terrance was her brother. On July 4, 2007, she first saw victim Terrance and Kendra at approximately 11:00 a.m. Later that evening, Latesha, Roger, and her children went to Parkway Commons. She received a call from Otissa sometime between 6:00 to 7:00 p.m. asking Latesha to come to Parkway Commons to pick up Latesha's nephews and Otissa because they were "having problems with some neighbors of theirs." When Latesha and her family arrived at Parkway Commons, they parked their vehicle, a black Yukon, in front of Latarsha's apartment. Victim Terrance and Kendra were already there.

After parking, Latesha walked over to victim Terrance, Kendra, and Latarsha, who were all outside talking. Rashada then started "[c]ussing [Latarsha] out from across the walk." Rashada came across the parking lot because she wanted to fight Latarsha. She agreed that Rashada and Latarsha exchanged words that "were not friendly[.]" Kendra then told Rashada "to go on back across the walk and then [Rashada] got in [Kendra's] face." Kendra and Rashada then got into a physical fight that only lasted a few minutes.

Latesha stated that when she first saw the Defendant after the fight he "was aiming to shoot [victim Terrance]." She had "no idea" where the Defendant came from – he "just came out of nowhere." She also did not know from where the Defendant retrieved his gun because he "already had it pulled out" when she saw him. Latesha was standing close to victim Terrance and saw the Defendant shoot him. The first shot that the Defendant fired struck victim Terrance in the stomach. She did not know how many shots she heard that evening but stated that it was several.

When victim Terrance realized that he had been shot, "he was trying to get into [her] truck" so she could drive him to the emergency room. She stated that "they" helped him into her vehicle and that Roger drove victim Terrance to the hospital.

Prior to the shooting of victim Terrance, Latesha did not hear the Defendant or victim Terrance say anything to each other. Additionally, Latesha did not see victim Terrance have any conversations or interactions with the Defendant earlier that evening. Latesha denied that victim Terrance was angry when she arrived. Instead, he was "in good spirits."

Latesha testified that she also was shot in the knee and that a "bullet grazed [her] chin." It was not until after she "checked on [her] children" after the shooting that she realized she had been shot. She eventually left the scene by ambulance and was transported to the MED where she stayed for several hours.

---

[5] Latesha's name was Latesha Harris, as reflected in the indictment, when the shooting in this case occurred. Since that time, she and Roger Boyd, her fiancé at the time, married. Thus, she testified at the time of trial that her name was Latesha Harris Boyd.

On cross-examination, Latesha stated that she did not remember how long after she arrived that Latarsha and Rashada got into the verbal altercation. She stated that none of Rashada's family assisted in breaking up the fight between Rashada and Kendra. She denied that she, Latarsha, or victim Terrance said anything to Rashada when they "grabbed" Kendra to break up the fight.

No one was standing between herself and the Defendant when he began shooting. She saw people standing behind the Defendant, but she did not know if people also were standing in the parking lot behind her and victim Terrance. Once the Defendant "started shooting[,] everybody started running." After the Defendant shot victim Terrance, victim Terrance "pushed [her] out of the way" to the side of him, and she "fell beside his car." She agreed that after she fell to the ground she could not see what happened. However, she knew that victim Terrance did not fire any shots "because he didn't have a gun." She agreed that "this entire episode . . . last[ed] a matter of seconds[.]"

Roger Boyd testified that he was married to Latesha. Roger's testimony was substantially similar to Latesha's testimony through the time that the Defendant shot victim Terrance.

After Roger saw victim Terrance get shot, he "started down the hill" toward victim Terrance. Roger stated that he only took two or three steps, and then, "That's when I saw [the Defendant] turning towards me." Roger described that the Defendant pointed his gun at him and "fired." When he saw the gun pointed at him, he "turned and tried to run." Roger "took a couple of steps and [he] was on the ground." He did not know at the time that he had been shot in the "[r]ight butt cheek." The bullet did not penetrate the skin, it "graze[d]" it. He realized that he had been shot the following morning because every time he sat down "it would hurt." He retrieved his "pants and the underwear that [he] had on that night and looked and saw that it was a bullet hole in them." Roger did not remember how many shots he heard the Defendant fire that night. However, he heard "a click, like a snap, like something jamming," and the shooting stopped after that. He saw the gun that the Defendant had in his hand that night and believed that it was a nine-millimeter.

After the shooting, Roger saw victim Terrance partially in the back passenger seat of his vehicle. He "was in bad shape" and was not able to stand up or walk. He then drove victim Terrance to Methodist South. Roger did not go inside with victim Terrance because he received a phone call that Latesha and Damarius had been shot as well. Roger immediately went back to Parkway Commons, which was approximately five to six miles from the hospital.

When he got back to the apartment complex, police were already on the scene. "As soon as [he] pulled up . . . people was [sic] pointing at [his] truck." The police came to his

vehicle and asked him to get out of it. They patted Roger down and then searched his vehicle. He spoke to the police briefly at the scene and gave a formal statement at the MPD at approximately 2:00 a.m. on July 5, 2007. Roger identified a photographic lineup on which he had circled the Defendant's picture as the shooter.

On cross-examination, Roger agreed that the fight between Rashada and Kendra was "kind of violent" because "one of the ladies hair g[o]t pulled out[.]" He agreed that his vehicle was about ten feet away from where the shooting happened and that he was standing on a small hill in front of his vehicle at the time.

Roger denied that during the drive to the hospital he "got rid of the gun[.]" On redirect examination, Roger testified that victim Terrance did not have a gun that night and that he did not own a gun. Thus, he stated that there was no gun to "get rid of[.]"

Carolyn Williams testified that in July 2007 she lived at Parkway Commons. On July 4, 2007, Carolyn was outside of her apartment when she witnessed an argument between Latarsha and the Defendant sometime after dark. The Defendant was "calling [Latarsha] names" such as "B-I-T-C-H and H.'s and tramps and all of those kinds of names." The argument ended when Latarsha "said something about calling her kinfolks over there, her people over there." Carolyn remained outside after the argument.

Carolyn then later observed that "[t]here was [sic] two women that got in a fight and then the deceased man broke the fight up, then [the Defendant], he came out of nowhere, then he pulled a gun out and then started shooting." Carolyn elaborated that after the fight she saw the Defendant come from the right side of the garbage dumpster "towards the guy who died, the deceased, he was coming toward him." She added that she saw the Defendant "just walk up and he put a little smile on his face and he had a gun, right here, so he took the gun out and started shooting." The gun was "inside his waistband pants." She was standing "[n]o more than four feet" away from victim Terrance when she saw him get shot. She and Erma Grice, another resident at Parkway Commons, were standing "side to side" when the shooting started. Carolyn saw the first two shots that the Defendant fired. After she saw the Defendant fire two shots, she and Erma ran, still hearing the shooting.

Carolyn did not see victim Terrance do anything to acknowledge the Defendant as the Defendant was walking toward him. She also did not believe that the Defendant said anything before he pulled the gun out and started shooting "because he walked up and he just smiled." Additionally, Carolyn denied that victim Terrance had "any kind of weapon on him."

Carolyn was "grazed" by a bullet on her left shoulder and left leg. She went to the MED that night in an ambulance. She remembered that the paramedics took "something off

-8-

of [her] left shoulder" while she was in the ambulance. She described that it "looked like a bullet, a shell of a bullet." She could not recall whether a police officer came to the MED to speak to her. She, however, believed that she did give a formal statement regarding the events that took place that night at some point. Carolyn identified a photographic lineup at trial on which she had circled the Defendant's picture as the shooter.

On cross-examination, Carolyn denied that she ever discussed what occurred that night with "several members of the Harris family." She agreed, however, that she had talked with Latarsha, who she first met after the shooting.

Carolyn again stated that victim Terrance and the Defendant did not speak to one another when the Defendant "walked up to him." She agreed, however, that in a prior statement she said that the Defendant "said a couple of words to him and the other guy said a couple of words back to him, so then like the other guy started shooting and he was shooting, so I was running."

Carolyn did not know what type of gun the Defendant used that night but recalled that it was black. She could not recall whether she had told police officers in her prior statement that the gun the Defendant had was a twenty-two caliber handgun. She also could not recall that the police officers asked her, "You said a small gun, was it a revolver or a pistol," and that she answered, "I'm not for sure, all I know is it looked like a .22." She stated that she did not know what a twenty-two looked like and that she did not recall describing the Defendant's gun as being a twenty-two caliber handgun. She also denied that she previously told police officers that she saw two men with handguns that night.

Erma Grice, another resident of Parkway Commons, testified that she was seventy-seven years old in July 2007. Erma testified that on the night of July 4, 2007, she and several others were shot by the Defendant. Erma was standing outside of her apartment earlier that evening and saw two women "scuffling," one of whom was Rashada. The Defendant "came up" during the "scuffle" and said, "[I]f anybody jump on his nephew he is going to come back and kill them."

Before the shooting occurred, Erma was standing outside her apartment with Carolyn about four feet away from victim Terrance. Erma stated that the Defendant "came up, he reached down in his pants and pulled up that gun and was just waving it." When the Defendant "came up," victim Terrance "wasn't doing nothing, but just looking." Erma did not hear victim Terrance or the Defendant say anything when the Defendant was "waving" his gun. She testified that the Defendant then "shot and shot [her] on [her] left side." She did not see him shoot victim Terrance because she "got out of the way" and ran. She realized that she had been shot when she was running because she saw blood. Erma was shot on her

left side and "then the bullet ricocheted on [her] arm." She had to get stitches, but no bullet was recovered from her body.

Erma identified a photographic lineup at trial on which she had circled the Defendant's picture and wrote, "This is the man that shot me and everybody and killed the other man." Erma did not see anyone else shooting, other than the Defendant, that night. Erma was "sure" that the Defendant was the shooter.

On cross-examination, Erma agreed that the shootings occurred at approximately 10:00 to 10:30 p.m. on July 4, 2007. She estimated that twenty-five to thirty people were outside in the area at that time.

Damarius Harris testified that he was fourteen years old at the time of trial. On July 4, 2007, he went to Parkway Commons with Latesha, Roger, and his younger brothers. When they arrived, Damarius went into Latarsha's apartment. His younger brothers stayed in the vehicle. He was inside the apartment for approximately six minutes before he came back outside and saw two women, one of whom he identified as Kendra, "[t]ussling."

Damarius then saw a car drive into the apartment complex occupied by the Defendant and two other men he did not recognize. Damarius described that "[t]hey was [sic] right behind the garbage can" and that he saw them "[p]utting something in their pants" – "[a] gun." According to Damarius, all three of the men, including the Defendant, had a gun.

Damarius described that there "was a big ole crowd and then [he] saw [the Defendant] walk up to [victim Terrance]." Damarius was "[a] few feet" away from victim Terrance when he saw the Defendant shoot victim Terrance. The Defendant did not pull the gun out until he "got up close" to victim Terrance, and then he immediately started shooting. When the Defendant shot victim Terrance, Damarius did not see the other two men shooting, and they did not approach victim Terrance with the Defendant.

Damarius was shot in his left hand while he was "just standing still." He did not see who shot him, and he did not realize that he had been shot until he later went inside Latarsha's apartment. He could not recall whether the shooting had stopped completely when he went inside the apartment. Damarius went to LeBonheur Hospital to have his gunshot wound treated. No bullet was recovered from his hand because the bullet went all the way through his hand.

Damarius identified a photographic lineup at trial on which he had circled the Defendant's picture and wrote, "This is the man that I saw shooting." Damarius also did not see the Defendant or victim Terrance speak to one another before the Defendant shot victim

Terrance. He stated, however, that it was too noisy for him to hear anything. He also did not see victim Terrance with a gun.

On cross-examination, Damarius stated that he and his family went to Parkway Commons at approximately 10:30 p.m. on July 4, 2007. Damarius agreed that the Defendant was standing around three to five feet away from victim Terrance when the Defendant shot him. He also acknowledged that he spoke with police officers after this incident on July 5, 2007. Damarius agreed that the police asked him, "Did you see when [the Defendant] shot your uncle." However, he denied that he responded to the police, "I saw him pull the thing back, but I did not see the shooting." Defense counsel presented Damarius with a portion of his statement, which read, "I saw him pull the thing back and I saw him shoot my uncle. I saw him pull the thing back – But I did not see the shooting." Damarius agreed that he signed this statement.

Jessica Carr testified that she was twenty years old. On July 4, 2007, she went to Parkway Commons sometime between 6:00 to 7:00 p.m. She was in front of Latarsha's apartment "hanging out" with her friends and "popping fireworks."

Later than evening, Jessica stated that Latarsha's sons were "popping fireworks at [them] . . . and that started an argument, because people was saying that they was trying to start something." Jessica described the verbal argument that occurred between Rashada [6] and Latarsha over this. Rashada told Latarsha, "I'm going to smack your son." Jessica saw the Defendant while the two women were arguing – "like standing off, though." He did not talk to either of the women while they were arguing.

After the argument ended, the women separated, and victim Terrance pulled up in a car. She believed that he was also with a "young lady" whom she thought was his girlfriend. She saw victim Terrance talk to his sister and then sit down on the front of his car. After that, Jessica saw Kendra get into a physical fight with another woman. Neither woman was injured, and victim Terrance broke up the fight. Jessica did not see the Defendant in the area during this fight.

Shortly after the fight, Jessica saw the Defendant approach victim Terrance and say, "What you over here for? What you supposed to be doing?" Victim Terrance responded, "I'm just here to stop anything, to check on my sister." She stated, "And then [the Defendant] came over there, like, pulling on his shirt, like, in a threatening way, like, tugging it like this and getting all rowdy and all of that." The Defendant asked victim Terrance again, "What you doing over here? What you supposed to do?" Victim Terrance again responded,

---

[6] Jessica referred to Rashada as "Neasha's momma." She did not know what "Neasha's momma's name" was. However, it is evident from the context that she was referring to Rashada.

"I am just over here to check on my sister to see what is going on. . . .  I'm not over here to start nothing."  After that, the Defendant "was like getting closer to him and stuff."  She described that "right when [the Defendant] walked closer to him . . . that is when he like, pulled up the gun and started shooting."  When the Defendant shot victim Terrance, the Defendant was "real close" to victim Terrance.  Jessica could not recall how much time lapsed between the fight and the shooting but agreed that the two incidents were close together.

Jessica did not actually see the Defendant's gun.  However, immediately after she saw the Defendant "like . . . pull up on his shirt," she heard gunshots.  She heard additional gunshots as she ran away.  She described that another male who was "tall, dark skinned" was with the Defendant, but she did not know whether he had a gun.  Jessica did not see anyone else with a gun or a bat, including victim Terrance.  She also did not see victim Terrance threaten the Defendant in any way.

After the gunshots stopped, Jessica came back outside and saw the Defendant leave the apartment complex in a silver car.  She also saw a black SUV speed away.  She gave a statement to the police in the early morning of July 5, 2007.  She identified a photographic lineup on which she had circled the Defendant's picture and wrote, "This is the person that I saw shooting Terr[a]nce."

On cross-examination, Jessica agreed that she was standing between four to ten feet away from the Defendant and victim Terrance when the Defendant approached victim Terrance.  She agreed that the gunshots sounded like they came from two different types of guns, stating, "Yes, . . . because it was like, loud, and you like hear another shooting that wasn't as loud – they didn't match up."  She believed six or seven shots were fired.  On redirect examination, Jessica agreed that she did not have any firearms training and that this was the first "gun battle[]" she had experienced.  Accordingly, she agreed that "it would be fair to say, [she] heard a lot of shooting, but [she] d[id]n't really have any idea what, if any, firearms, or how many firearms are going off out there."

Larry Pillowe testified that in July 2007 he was sixteen years old and lived at Parkway Commons with his brother and sister, Anthony and Takeisha Mears.  Larry stated that approximately five to ten minutes after a physical fight between two women ended, he saw the Defendant emerge from the area around the garbage dumpster.  The Defendant was "a couple of feet" from victim Terrance when Larry saw the Defendant pull his gun out and fire two shots, but he was "pretty sure there was a lot more [shots fired] than that."  He was not able to see victim Terrance, however, from the location where he was standing.  When the Defendant started shooting, Larry ran towards his apartment building.  Larry gave a statement to police officers after the shooting.  He also identified a photographic lineup on which he had circled the Defendant's picture and wrote, "This is the shooter."

-12-

Larry believed that he also saw victim Terrance with a weapon earlier that night. He stated, "I'm pretty sure I did, but like I said, it was so long ago I don't want to quote myself wrong." He did not know what type of weapon it was. He did not see victim Terrance threaten anyone that night, and victim Terrance was not aggressive toward anyone. Victim Terrance appeared "pretty laid back" that night and was "just over there chilling and he was just with his family."

On cross-examination, Larry agreed that he gave a statement to police stating that he saw "what [he] thought was a weapon in [victim Terrance's] left pocket." He did not know what size the gun was. Defense counsel asked, "But, . . . you're telling this jury that the gun was inside his left pants pocket?" Larry responded, "From what I assume, sir, yes." He denied that he saw victim Terrance take "that gun out of his pocket[.]"

Takeisha Mears, another resident of Parkway Commons, testified that in July 2007 she was fifteen years old. On July 4, 2007, she was dropped off at Parkway Commons at approximately 9:00 to 9:10 p.m. When she arrived, she talked to Tameako Omar, the Defendant's niece. Although she could not hear anything because fireworks were being shot, she subsequently realized that she had suffered a gunshot wound to her left shoulder. Takeisha was taken to LeBonheur by an ambulance for treatment of her gunshot wound.

She remembered that police officers came to her apartment to speak to her after she was released from LeBonheur. She stated that the police officers asked her "who was [the Defendant]," using a photographic lineup. On the lineup, she agreed that she "indicated that [she] knew" the Defendant by circling his photograph.

Anthony Mears, another resident of Parkway Commons, testified that in July 2007, he was fifteen years old. On July 4, 2007, Anthony explained that the Defendant walked up, stopped, "drew his weapon, released fire on the victim and killed him." Anthony was probably less that one foot away from victim Terrance when the Defendant pulled his weapon out. He did not run because he "didn't have enough reaction time to run, because of how close [he] was to the victim." He saw the bullets hit victim Terrance. He did not know how many times victim Terrance was shot but stated that it had to be more than once. He also denied that victim Terrance threatened the Defendant or moved in an aggressive way toward him prior to the shooting. Additionally, he did not see victim Terrance "pull[] a gun[]" on anyone prior to the shooting either.

After the Defendant shot victim Terrance, victim Terrance started "stumbling" and was "kind of wobbly." Anthony believed that he saw victim Terrance "pull [some]thing up," but he did not know if it was a gun or a cell phone. Anthony then identified a photographic lineup on which he had circled the Defendant's picture and wrote, "Dirty shot Terry." He also spoke to Officer William Merritt on July 5, 2007.

-13-

On cross-examination, Anthony agreed that he previously had met with the defense attorneys. He agreed that he told them that the Defendant pulled out a gun and started shooting victim Terrance. He added that the Defendant was standing in front of victim Terrance "[p]robably only a few seconds" before the Defendant started firing shots at victim Terrance. He also agreed that he told the defense attorneys that "right after that, [victim Terrance] pulled out a gun and fired back at [the Defendant]."

Sanverneado Pleas testified that in July 2007 he lived with Rashada, his girlfriend at the time. He also knew both of her brothers, Carlos and the Defendant. On July 4, 2007, after dark, he observed a physical fight between Rashada and another woman whom he did not know at the time. The woman was not hurt, "she just had got her hair pulled out." Rashada had a black eye from the fight. He did not see victim Terrance during the fight but later saw him after the fight sitting on the front of a car. After the fight, Rashada remained outside with Sanverneado.

The physical fight between Rashada and the other woman had been over for approximately five minutes before the shooting occurred. The Defendant "was standing . . . in [victim Terrance's] face and the next thing [Sanverneado] kn[e]w, gunshots was [sic] going off." He agreed that the Defendant was "right on top of [victim Terrance]" when the Defendant started shooting. Sanverneado did not see victim Terrance do anything to provoke the Defendant. He also did not see victim Terrance with a gun at any point.

Sanverneado heard more than five shots. He "only heard one [gun]" and stated that "it was real loud." When he heard the shots, he "[d]ucked down and tried to get Rashada's kids and take them back over towards" her apartment. He then went back to Rashada's apartment with Rashada and her children. He was still at her apartment when the police arrived. He did not see where the Defendant went after he shot victim Terrance.

The police took Sanverneado to the police department where he gave a statement and viewed a photographic lineup. Sanverneado identified the photographic lineup on which he had circled the Defendant's picture as the person that he saw shoot victim Terrance. At the police department, an officer checked his hands for gun powder residue.

On cross-examination, Sanverneado agreed that the police officers told him that he was going to get charged with second degree murder. He added, "Everything kind of cleared up when I told him that [victim Terrance] was my cousin and [the Defendant] was my girlfriend's brother."

Lieutenant Edward Hall of the MPD testified that in July 2007 he was a supervising lieutenant stationed at the "Public Housing Union Station." On July 4, 2007, he responded to Parkway Commons sometime between 10:30 to 11:30 p.m. When he arrived, he

-14-

supervised the officers who initially had responded to the scene. Lieutenant Hall described a "large crime scene area" and stated that several ambulances were called to the scene to transport victims to the hospital. He stated that the Defendant had been named as a suspect but that he was not one of the two men detained that night because he was not at the scene when Lieutenant Hall arrived.

Officer Alpha Hinds of the MPD testified that he was assigned to the crime scene unit in July 2007. He received a call at 11:15 p.m. to respond to Parkway Commons on July 4, 2007, and he arrived there at 11:54 p.m. As part of his duties, he collected evidence, made diagrams of the crime scene, photographed evidence, and drafted reports. Upon his arrival, bullets and shell casings already had been found by the officers who had responded to the scene. Officer Hinds walked the crime scene to determine whether there was any additional evidence to be collected, but he did not find any. Officer Hinds photographed the evidence found by the officers, which included spent shell casings; blood spots outside; spent projectile; a bullet fragment; and a Yukon, which had what appeared to be blood on the inside. He also drew a diagram depicting the location in which this evidence was found. Additionally, he collected the tangible evidence photographed: four spent, nine-millimeter shell casings; one spent bullet projectile; and one spent bullet fragment. These items were sent to the Tennessee Bureau of Investigation ("TBI") for testing.

On cross-examination, Officer Hinds agreed that when he arrived spectators were standing around the area. He stated, however, that they were outside crime scene tape which marked off the crime scene. He acknowledged that, prior to the officers' arrival and the crime scene being marked off, people were able to move freely about the scene.

Sergeant Israel Taylor of the MPD testified that in July 2007 he was assigned to the felony response bureau. He was dispatched to Parkway Commons on July 5, 2007, sometime in the early morning. His duties consisted of identifying possible witnesses, identifying possible suspects, and assisting crime scene investigators with collecting and documenting evidence on the scene. He stated that they identified the Defendant as a potential suspect, but the Defendant was not on the scene when he arrived. At some point during his investigation, the case was turned over to homicide, and homicide eventually located the Defendant.

When Sergeant Taylor arrived, he "thought that the shooting was still going on" because "it sounded like a mix of firecrackers, fireworks, [and] small arms" being fired. He stated, however, that it was not unusual for people in Memphis to fire guns on July 4th. When he arrived, the witnesses who had sustained injuries already had been transported to the hospital. There were other witnesses present on the scene. In order to prevent the witnesses from discussing among themselves what occurred to "protect the integrity of their statements," the officers separated the witnesses by placing them in separate patrol cars.

When the patrol cars each had a witness in them, an officer stood with each of the remaining witnesses to ensure that they did not interact with other potential witnesses or suspects.

Sergeant Taylor "canvassed the area for evidence" and searched a large portion of the apartment complex for evidence. He did not find any evidence in addition to the evidence that Officer Hinds already had located and tagged. Sergeant Taylor was present while other officers searched the Yukon in which Roger had driven victim Terrance to the hospital. No weapons were located inside of the Yukon. The officers did find what appeared to be blood inside the vehicle.

Sergeant Taylor also was present when Officer Beckham performed gunshot residue tests on Sanverneado and Sedric. Sergeant Taylor requested a gunshot residue test for Sedric because he was informed that Sedric "was possibly armed earlier in the day and was shooting a weapon inside the complex." He requested that a gunshot residue test be performed on Sanverneado because Sanverneado was Rashada's boyfriend. Sergeant Taylor testified that, while he was on the scene on July 5, 2007, he did not see anything which would have indicated to him that there was more than one shooter involved. However, he did not dismiss that possibility completely.

On cross-examination, Sergeant Taylor stated that he did not follow the path that Roger could have taken in the Yukon from Parkway Commons to the hospital "to see if any evidence was dropped off somewhere[.]" The Yukon was searched almost immediately upon its return to the apartment complex. He also acknowledged that he did not know where the Yukon had been that evening after it left the scene. Although he spoke with Roger that night, to his knowledge, neither he nor other officers searched Roger.

On redirect examination, Sergeant Taylor stated that he took a statement from Roger at approximately 2:33 a.m. on July 5, 2007, at the felony response office. He stated that "[m]ore than likely" Roger would have been transported to the felony response office in a police vehicle. He also agreed that anyone who was placed in a police vehicle was first patted down or searched.

Officer Alvin Moore of the MPD testified that in July 2007 he was assigned to the felony response unit. Officer Moore and his partner, Sergeant Taylor, responded to the shooting at approximately 12:50 a.m. on July 5, 2007.

When Officer Moore arrived on the scene, he took it over from "uniform patrol." He first talked to them to determine what had occurred. He believed there were either four or five officers and sergeants at the scene from the felony response unit. There also were multiple victims and witnesses, but most of the victims already had been transported to the hospital.

Officer Moore assisted crime scene investigators that night by taking photographs of the scene and of evidence. He also personally looked at the Yukon in which victim Terrance was transported to the hospital. Officer Moore took a few photographs of the Yukon while he was at the scene, including photographs that depicted what appeared to be blood on the passenger side floorboard and on the door panel. He also took two statements from witnesses on the morning of July 5, 2007. Rashada gave a statement at approximately 5:00 to 5:15 a.m. She did not have any visible injuries, and he did not note any injuries in his report. He did not testify regarding the identify of the person who gave the second statement.

Officer David Beckham of the MPD testified that in July 2007 he was assigned to the crime scene unit. On July 4-5, 2007, in this case, Officer Beckham took photographs of the injuries of Latesha, Damarius, Carolyn, and an elderly lady whose name he could not recall. He also collected a bullet fragment from Carolyn at the MED. He did not collect any bullet fragments from Damarius at LeBonheur. He then went to Methodist South and collected tennis shoes, green and white shorts, a blue Polo shirt, a white tee-shirt, white underwear, and a pair of white socks from "the main victim." Officer Beckham performed gunshot residue tests on Sanverneado and Sedric on July 5, 2007, at 3:20 a.m., which were sent to the TBI.

On cross-examination, Officer Beckham testified that no gunshot residue test was performed on victim Terrance. On redirect examination, however, he stated that the MPD typically did not perform gunshot residue tests on deceased individuals unless it was requested specifically.

Officer William Merritt of the MPD testified that in July 2007 he was assigned to the homicide squad. He was involved in the investigation of the shooting that occurred on July 4, 2007, at Parkway Commons. Officer Merritt interviewed Anthony Mears on July 5, 2007. He spoke to him at his apartment, with the permission of his mother. He did not record Anthony's statement, and Anthony did not make a written statement that night, but Officer Merritt documented what Anthony told him in a "supplement." He stated that a supplement was executed anytime he participated in the interview or interrogation of someone. His supplement indicated that he went to Parkway Commons to speak with Anthony at 1:15 p.m. on July 5th. He executed the supplement in writing at 2:40 p.m. on that same day.[7]

The supplement report stated as follows:

Anthony Mears stated he was an eye witness to the shooting. He was asked to read and sign a photo spread instruction form before he looked at the photo

---

[7] Officer Merritt testified that he edited the supplement at 3:54 p.m., which meant that he "would have saved it, maybe done something else and then just went back and finished writing, or typing the document out on the computer."

-17-

spread that contained the photo spread of [the Defendant]. Anthony Mears was able to positively identify [the Defendant] as the person responsible for the shooting. Anthony Mears stated that no one else fired shots and he did not see anyone else with a gun.

I told . . . Anthony's mother [that] we would need to obtain statements from Anthony and Takeisha Mears, once Takeisha recovered from her injuries.

Officer Merritt stated that he made arrangements for Anthony to come to the police department to give a formal statement but that Anthony never did.

On cross-examination, Officer Merritt acknowledged that Anthony only was briefly mentioned in his supplement and that much of the supplement was devoted to other witnesses. He also acknowledged that at the time he spoke to Anthony, he had been awake and working for approximately thirty hours.

Officer Eric Ervin of the MPD testified that he was assigned as a patrolman on July 7, 2007. He was instructed to go to LeBonheur to tag and pick up evidence. He retrieved "one round" that was removed from Takeisha Mears' left upper shoulder.

Sergeant Eric Freeman of the MPD testified that he worked in the homicide bureau in July 2007. He was the case coordinator in the investigation of the death of victim Terrence. As the case coordinator, he was in charge of the case, prepared the paperwork for prosecution, and instructed other investigators what to do on their cases. He became involved in this case at approximately 1:00 a.m. on July 5, 2007. At some point in the evening on July 6, 2007, officers apprehended the Defendant.

On cross-examination, Sergeant Freeman agreed that part of his duties as case officer included "property release" to the State for purposes of trial as well as to family members when an item was not considered evidence. In this case, on July 10, 2007, he released one set of keys and $36.40 to Kendra but denied releasing a cell phone to her.

Special Agent Laura Hodge, a forensic scientist with the TBI, testified as an expert witness in gunshot residue. In this case, she analyzed gunshot residue kits collected from Sanverneado and Sedric. In performing the gunshot residue analysis, Special Agent Hodge testified that she received Q-tip swabs that were scrubbed on the surface of Sanverneado and Sedric's hands. She chemically analyzed those swabs for the presence of three different elements that make up the "primer composition of a cartridge."

Special Agent Hodge explained that gunshot residue "is very fragile evidence" that is located on the surface of an individual's hands. She stated that there "are a lot of factors

involved with evidence this very fragile[:] Everything from the type of weapon it was. How many times it had been fired. What type of ammunition. Was it a well made weapon, or not a very well made weapon. Was the weapon well maintained, or not."

One of the largest factors in recovering gunshot residue is time and what the individuals did with their hands from the time of the shooting until the time that the kit was collected. According to Special Agent Hodge, rubbing hands on clothing, washing hands, showering, and even changing clothes could remove gunshot residue. Also, if someone were gone for two or three days after firing a weapon, she would not expect to find gunshot residue because "that is outside the window" of time. She also stated that it is not uncommon for victims of gunshot wounds to have gunshot residue on them.

The results from Sanverneado's gunshot residue kit were the following: "Elements indicative of gunshot residue were inconclusive. These results cannot eliminate the possibility the individual could have fired, handled, or was near a gun when it fired." With regard to Sedric's gunshot residue kit, "[e]lements indicative of gunshot residue were present. These results indicate the individual could have fired, handled, or was near a gun when it fired." She did not receive a gunshot residue kit from the Defendant or victim Terrance.

Dan Royse of the TBI testified as an expert witness in firearms analysis. He received clothing from victim Terrance, bullet packs, and bullet fragments in this case. In examining the clothing, he attempted to "perform a muzzle to garment distance determination on each one of the[] items of clothing." First, he documented the clothing, including photographing it. He then examined the clothing "microscopically[] for any particles of gun powder residue or scorching, or tearing of the material." He looked for anything that could be a bullet hole. Next, he processed the clothing for nitrates, which is a chemical compound that comes from burned or partially burned gunpowder residue. He then processed it "chemically for the presence of lead residues." He looked for lead particles from the barrel of the firearm or bullets, and he looked for lead vapor "caused by the primer on the cartridge."

Royse stated that the blue Polo shirt had two holes in it. The hole toward the bottom of the shirt had "a little ring of . . . lead white, which [was] consistent with a bullet pushing its way through the clothing." The hole in the "front center [of the shirt was] consistent with a close range discharge of a firearm." This bullet hole had "lead vapor which is atomized lead particles that come out of the barrel and only go about two feet." The white t-shirt had three holes in the front side of it. The hole in the front center tested positive for lead residue, and it corresponded with a hole in the Polo shirt. Royse found no residue on the other two holes toward the bottom of the shirt. The plaid shorts had five holes in the front-side. Royse did not find any "residues on any of these holes," meaning that there was "no lead, no gun powder, so [he couldn't] make a determination as to whether it's a bullet hole, or not."

Royse also found one hole in the back right leg of the shorts. This hole had "lead white" which was "consistent with the passage of a bullet." The brown leather belt had one hole in it to the right of the belt buckle on the right hip if the belt were being worn. Royse found no residue, so he could not make a determination as to what caused the hole. Neither tennis shoe had any holes in them for examination. The underwear had one hole in the front side and two holes in the back side. None of these holes had gunshot residue. Royse stated that he generally does not "report out inner garments, such as the under shirt, or the underwear." He does examine those, however, but the residue that he looks for are found on the exterior garments.

Royse also examined a "122.8 grain[] lead bullet core" recovered from Carolyn Williams;[8] four "Winchester nine-millimeter [l]uger cartridge cases" recovered the crime scene; a "146.4 grain jacketed hollow point bullet" recovered from the crime scene; a "164.1 grain[] full metal case bullet" recovered from the crime scene; a "39.4 grain twenty-two long rifle, round nosed lead bullet" recovered from Takeisha Mears; and a "146.5 grain . . . jacketed hollow point bullet" received from the Shelby County Morgue. Royse performed bullet examinations and comparisons and cartridge case examinations and comparisons to determine if bullets had been fired through the barrel of the same weapon. He explained that every firearm has "its own unique set of markings." Thus, he compared those items microscopically and looked for a "mechanical fingerprint." First, he looked for "class characteristics," which were markings that were intentionally placed on a firearm by the manufacturer. Next, if two bullets had the same class characteristics, he then looked for "individual characteristics" which were "those random accidental irregularities in the gun barrel" that can be caused by things such as "use and misuse and rust and corrosion and bad cleaning techniques." He stated that "cartridge casings are identifiable in much the same way that bullets are."

Royse determined that the "122.8 grain[] lead bullet core" recovered from Carolyn Williams was a "lead bullet core" which did not bear "any markings of value for comparison purposes." The bullet was missing the "jacket," which was the only part of the bullet that came into contact with the barrel of a gun. He agreed that it was "consistent with the grain weight of a nine-millimeter[.]" Royse next determined that the "146.4 grain jacketed hollow point bullet" recovered from the crime scene and the "146.5 grain . . . jacketed hollow point bullet" recovered from the Shelby County Morgue were both nine-millimeters bullets and both were fired through the barrel of the same firearm. It was not unusual that the bullets were 146.4 and 146.5 grains when he examined them because the grain weight "is almost always less than when it started." The four Winchester nine-millimeter cartridge cases also were all fired through the same firearm. Royse was not able to determine whether the four

_____

[8] This item originally was marked that it was recovered from victim Terrance. However, it was modified to reflect a different victim's name: Carolyn Williams. His report reflected this change as well.

Winchester cartridge casings were fired through the same firearm from which the two nine-millimeter bullets were fired. He stated that, "in the absence of the firearm[,] there is no way to determine, other than the fact that they are the same manufacturer and the same caliber." He did not receive a firearm to examine in this case.

The "164.1 grain[] full metal case bullet" recovered from the crime scene was a ".40 caliber, full metal case bullet that had been fired, in all likelihood[,] in [a] Glock semi-automatic pistol." The "39.4 grain . . . round nose lead bullet" recovered from Takeisha Mears had "rifling characteristics present" "common to a variety of .22 class caliber weapons."

On cross-examination, Royse agreed that Takeisha Mears was shot with a twenty-two caliber weapon. He agreed that it is not possible to fire a nine-millimeter bullet through a forty caliber weapon or to fire a nine-millimeter bullet through a twenty-two caliber weapon. Thus, he agreed that this "would indicate that there were, at least, three different guns that were present, or used at the crime scene."

Doctor Miguel Laboy testified as an expert witness in forensic pathology. He worked for the Shelby County Medical Examiner's Office as an assistant medical examiner and performed the autopsy on victim Terrance. He found a gunshot wound to the chest and to the right thigh. There was no exit gunshot wound in the chest. He ultimately recovered a bullet that came from that entry gunshot wound in the pelvic area. The "wound track process runs front to back, slightly on a downward orientation and slightly from his left to his right." Doctor Laboy agreed that this injury would be "lethal." He classified the bullet as a "medium caliber, slightly deformed jacketed bullet." He agreed it would "be like a nine-millimeter" "[o]n the range."

The second injury was a gunshot wound to the right thigh. The "wound track passes from his front to his back, slightly downward and slightly from his left to his right." This wound had "an exit defect, but it was on the side of the right thigh, slightly inferior to the entrance." He did not record any bullet or bullet fragments with respect to this injury. The femoral vessels also were still intact so there were no perforations to the major vessels in that leg. In a normal, healthy individual, because the femur vessels were still intact, he would expect that a person who sustained that injury most likely would survive.

Doctor Laboy was not able to determine which injury occurred first. He stated that the chest gunshot wound injured major organs, so there was continuous bleeding from those organs. However, it was not a wound that would have rendered victim Terrance immediately unconscious. "[T]here [was] . . . a period of time that [victim Terrance was] . . . lucid for." He stated that the manner of death was homicide.

Doctor Laboy testified that in some cases he collects a gunshot residue kit. It usually is performed upon the request of law enforcement. Additionally, he generally does not collect that evidence when the individual has been at a hospital and "multiple people [have] touch[ed] the body and the evidence is not secure." He did not collect a gunshot residue kit from victim Terrance. He performed a toxicology screen on victim Terrance, however, and it was positive for marijuana.

The State rested its proof. The Defendant moved for a judgment of acquittal which was denied by the trial court. The defense began its proof and called Sedric Graves as its first witness. Sedric testified that he and the Defendant were friends in July 2007. He stated that on July 4, 2007, he was at Parkway Commons. He acknowledged that he had a thirty-eight caliber handgun with him that day that he shot to celebrate July 4th. He shot it in the air six times that day behind one of the apartment buildings shortly before it got dark outside. Approximately ten to fifteen people were standing outside at that time.

Sedric witnessed the fight between Rashada and another lady whom he did not know. He tried to break up the fight, but he "didn't succeed in breaking the fight up, because when dude upped the gun, [he] walked off." He stated that victim Terrance was the "dude that upped the gun." Victim Terrance was standing beside the fight "[h]olding the gun in his hand" when Sedric saw him. He did not know what type of gun it was, but it looked like a small revolver.

Approximately two to three minutes after Sedric walked away, he started hearing gunshots. He was not able to see whether victim Terrance was shooting, and he did not personally witness the shooting. Later, police officers escorted Sedric to the MPD. He gave a statement but did not tell the officers in the statement that he had seen victim Terrance with a gun that night because he "really didn't want to have nothing to do with what was going on."

On cross-examination, Sedric denied ever seeing the Defendant with a nine-millimeter handgun that day. Sedric denied previously stating that the Defendant "had a nine-millimeter automatic handgun that he was shooting." He also denied that he went to get the Defendant after he saw Rashada and another lady fighting. He agreed, however, that he called the Defendant and told him that Rashada was in a fight and that the Defendant then came right back over there.

Sedric agreed that in the last four years since the shooting he never told anyone that victim Terrance had a gun. He denied that he told the police in his statement "that [the Defendant] was the one that killed [victim] Terr[a]nce." He acknowledged, however, that he told the police that he "knew the person who was responsible for shooting [victim] Terr[a]nce." He heard that the Defendant was responsible for the shooting because "[y]ou

-22-

hear everybody outside screaming who was shooting and stuff." He, however, did not see the Defendant shoot victim Terrance.

Rashada Omar testified that the Defendant and Carlos were her brothers. In July 2007, the Defendant would stay with her occasionally at Parkway Commons. On July 4, 2007, she and Latarsha got into an argument about Latarsha's "son shooting fireworks at [her] kids and other things that had been going on before that." The argument with Latarsha lasted approximately five to ten minutes. She agreed that the Defendant "join[ed] in" the argument. After the argument, Rashada was going to go speak with her daughter and ask her about the "whole situation." However, "that's when [victim Terrance's] girlfriend said something and she was like, this is some dumb stuff and all of that." The two of them got into a physical fight that lasted approximately five minutes. During the fight, victim Terrance and Carlos both were trying to break up the fight.

As a result of the fight, she pulled a muscle in her shoulder, got bit on her face, "got a blood vessel in [her] eye," and got "a black eye." She also stated that Latarsha's son had been standing around with a bat and that Carlos took the bat away from him.

After the fight, Rashada began walking back toward her apartment. She saw the Defendant "walking up" as she was leaving. He was "smoking a cigarette and was walking towards . . . [victim] Terr[a]nce." She did not see what happened next, but she heard one gunshot.

Prior to the Defendant testifying, a jury-out hearing was held to determine the admissibility of his prior convictions for impeachment purposes. The State requested that three convictions be admissible: convictions for aggravated robbery from 1992, aggravated assault from 1992, and especially aggravated robbery from 1992. The trial court held that the especially aggravated robbery conviction was admissible.[9]

The Defendant then took the stand. He agreed that he previously had been convicted of especially aggravated robbery. He stated that in July 2007, he was living with Rashada at Parkway Commons. He stated that he knew victim Terrance because Rashada had introduced the two of them. The Defendant testified that late in the day on July 4, 2007, he went to Marquita's apartment. Marquita lived in the apartment building next to Latarsha.

_____

[9] Pertaining to this especially aggravated robbery conviction, the trial court restricted the State from discussing the victim, whether the victim was male or female, whether a weapon was used, and the facts surrounding the conviction. The trial court also held that the State could not mention that the victim was seriously injured "unless the door is opened and we have a hearing first."

They "started popping fireworks." At that time, the Defendant did not have a gun with him. He then received a phone call from his ex-girlfriend to go with her to the store.

While he was at Marquita's apartment, the Defendant saw Rashada and Latarsha get into an argument. He walked next to Rashada and realized they were arguing about "Latarsha's children popping fireworks on [his] sister's children." The Defendant then "addressed Latarsha [him]self" because she had said "some things that had hurt [his] little sister's feelings." He stated that he thought that he "need[ed] to help her, because Latarsha was like roasting her," so he "cussed out Latarsha." After they "went back and forth," he stated aloud, "[M]an you know since we doing all this lip boxing . . . do y'all really want to fight then, y'all can fight, so what do y'all want to do?" The Defendant testified, "And then, nobody said nothing. . . . [A]nd I said, that's what I thought." The Defendant had a gun on him at that time.

The Defendant then told Rashada, her children, and Carlos, "[C]ome on y'all, ain't nothing left to see out here." They all went to Rashada's apartment. He then went and got into his ex-girlfriend's car but did not make it to the store. By the time that he "got into traffic," he received a phone call from Sedric. Once he received the phone call, he told his ex-girlfriend, "[T]urn around, turn around, I got to go back." She could not make a U-turn, so he "jumped out of the car while it was still running" before they even got to the front gate of the apartment complex. After he jumped out of the car, he ran through the gate.

The Defendant stated that he ran back to the apartment complex because "I was under the impression that my sister was being jumped on and that someone had a gun and my sister's life was in danger. So I was coming to my sister's aid, that is why I was running." He first ran to the area near Rashada's apartment building because he last saw Rashada in her apartment. He then looked to the left and saw that the "fight was going on." He stated that the "garbage can was obstructing [his] view from the crowd and [he] wasn't able to see them until [he] got passed [sic] the garbage can and that's when [he] seen this crowd that was there." He went towards the crowd because he thought Rashada would be there.

The Defendant then stated,

So when I came across the lot I stopped running, I stopped running and I went around this way and I was looking on the ground. I was looking like in between people's legs. And the reason why I was looking between people's legs is because like I say, I was under the impression that my sister was being jumped on, so she would have had to been on the ground.

The Defendant also stopped running at that time because he was "under the impression that someone had a gun." His gun "was on [his] waist at the time." As the Defendant was

-24-

looking on the ground for Rashada, the "crowd separate[d]." Defense counsel asked, "And what do you do?" He responded, "Well, I reacted to [victim Terrance] . . . because when the crowd separated he was there in the middle and he whipped around on me and went up under his shirt. When he went up under his shirt, I went up under my shirt." The Defendant stated that he was not running toward victim Terrance at that time but that he "was walking real fast. [He] was taking like long strides, swift strides." He described that victim Terrance's gun was "a dark color." Defense counsel asked whether he could "clearly see if [victim Terrance] had a gun, or not?" The Defendant responded, "Yes, it was his movement. Just his movement alone is going to tell you that he was going for a gun. He wasn't like fixin' to call somebody."

The Defendant described what happened next:

When [victim Terrance] went for his gun, . . . he didn't instantly level it to me, because at the time I was going for my gun. Now, my gun I have to cock it, you know. So when I'm going for my gun, that's when [victim Terrance] leveled the gun and he fired a shot. But, as he was leveling the gun and firing the shot, I had to cock my gun and then I was raising it. When he shot his first shot, I went down on the barrel. But his gun was – and I closed my eyes, like this, (indicating), because I thought I took a head shot. That's because I was looking at the gun, just like this. I was looking at it. Then I closed my eyes like this and when I didn't feel any kind of impact, I rushed at him and I pulled the trigger. That is how close a distance between. And then I stopped when [victim Terrance] was wobbling. I had hit him, I know I had hit him and he was still firing. So while he's still firing, I'm kind of caught off guard, looking at my shirt[] . . . . I'm standing there looking at my shirt, because my shirt is kind of white, so I'm thinking I'm going to see some blood, you know. And then, that's when I like know that, okay, he's still shooting. But, he's clearly like, you know what I'm saying, he's just firing it off, he's just firing off, so I just turned around and I ran.

The Defendant thought that he had fired three shots, but he acknowledged that "four shells" were found at the crime scene. After the shooting, the Defendant left the scene and did not turn himself into the police. He stated, "I got a gun, that's why I ran."

On cross-examination, he agreed that he was not supposed to have a gun. He stated that the gun that he had that night was a nine-millimeter. He had retrieved his gun from Carolyn's apartment "later on that night when [he] was going to go celebrate" and agreed that he "shoved it in [his] pants." He did not know Carolyn's last name but stated that it was not Carolyn Williams. He had his gun and some clothing at her apartment. He had planned on

-25-

shooting it in the air at the apartment complex to celebrate July 4th but decided against it. He acknowledged that Sedric shot his gun into the air earlier that day.

He also stated that when Rashada and Latarsha were arguing, Latarsha's family "came to her side." He denied that he made threats when he went to his "sister's side." The Defendant already had his nine-millimeter with him at that time. The State asked the Defendant, "So was it during that argument that you told Latarsha that if anybody messes with my nieces and nephews I'm going to come back and kill somebody?" He replied, "I do not recall saying anything of that nature."

The Defendant stated that he still had his gun on him when he got into the car with his ex-girlfriend because he "was in such a hurry to get away from what was going on in those apartments." He denied that he had his "pistol drawn" when he ran toward the crowd. He could not "tell whether it was a fight, or not, because there was a big crowd." He did not see Rashada, and he did not see a fight at that point. The Defendant also denied that he was less than twenty-four inches from victim Terrance when he shot him or that he was "right on top of him." He stated, however, "I went toward him after he fired his weapon. I rushed at him." He denied that he also shot Erma Grice. The State asked whether he "managed to hit Carolyn Williams," too, and he responded, "I have no idea." He "disput[ed] the fact that [he] hit all of them people standing around, because . . . the way [he] was going and the way they was at when they was struck, [he] couldn't have hit them." He stated that he "did not have the opportunity to access [sic] the situation, because . . . the crowd separated and [he] reacted to what [he] saw."

The Defendant stated that the crowd immediately broke up when he was running in that direction. The State asked whether it could be "because you're running toward them with a gun sticking out of your pants?" The Defendant responded, "Well, it could be, because Latarsha testified, I heard she yelled out to him, that's why the crowd separated like they did." He believed that victim Terrance had a "twenty-two" but that he "wasn't sure" and "not quite sure what the color of it was."

The Defendant testified that he also spoke to victim Terrance "about the incident" between Rashada and Latarsha. They spoke after Rashada and Latarsha had argued and after he had argued with Latarsha. Victim Terrance was sitting on his car and asked the Defendant, "Dirty what's going on?" The Defendant replied, "[A]in't nothing going on." The Defendant stated that he saw Rashada walking in that direction and said to her, "[S]ister is there anything going on," and she replied, "[B]rother ain't nothing going on." The Defendant then said to victim Terrance, "[T]here goes your answer." The Defendant left after that. He stated that it was a "cordial exchange" between the two of them.

The Defendant testified that the reason that victim Terrance shot at him "would be []" that my sister was fighting his girlfriend." The Defendant acknowledged that he did not see the fight between Rashada and Kendra. The Defendant also denied that he "turned the gun on Roger Boyd" after he "unloaded on" victim Terrance. The only person that he was aware of shooting was victim Terrance. After he left the scene, he knew that the police had been looking for him. His "plan was to see [his] mother and then turn [him]self in."

The defense rested its proof. After deliberations, the jury found the Defendant guilty of the following: count one, second degree murder of Terrance Harris; count two, attempted voluntary manslaughter of Latesha Harris; count three, attempted second degree murder of Carolyn Williams; count four, attempted voluntary manslaughter of Damarius Harris; count six, attempted second degree murder of Erma Grice; and count seven, attempted voluntary manslaughter of Roger Boyd. No verdict was reached as to count five, attempted first degree murder of Takeisha Mears. The judgment reflects that the State dismissed this count.

At the sentencing hearing, held later, the following documents were admitted as exhibits without objection: the Defendant's presentence report; a certified copy of the Defendant's "Pen Pak" from the Tennessee Department of Correction; certified copies of the Defendant's "indictments and the judgment sheets" from his prior adult convictions; the guilty plea and sentencing hearing transcripts of the Defendant's prior adult convictions; and a "Pre-Trial Services Report," which detailed the Defendant's juvenile record.

The Defendant testified on his behalf. He agreed that he had been "getting into trouble for a long time." He attributed this fact to his "environment." In this regard, he stated, "In my neighborhood the guys that I hung around, . . . we did things, we stole, we did whatever we could to get money so it was a hustle that was going on at the time." Defense counsel asked why he continued after the "[c]ourts and probation officers and social workers told [him] that was wrong[.]" He responded,

> It's what paid the bills. My mother had five kids by herself in the projects so, you know what I'm saying, we needed food, we needed bills paid, we needed a roof over our heads, we needed lights on, we needed clothes to wear to school, so I took it upon myself to go out there and help my mamma [sic] provide those things.

In terms of whether the Defendant tried to "find legitimate work," he stated, "We'd go . . . like to a trucking company and stuff and help people load up trucks and stuff. You know, it was all kinds of – it wasn't just criminal things."

The Defendant next explained his prior convictions. With regard to his prior especially aggravated robbery conviction, he stated: "Well, actually I did not rob the person.

. . . I just shot him.  The person said when he was asked why did I shoot him he said I guess he was trying to rob me. . . .  I made bond on the charge." He continued:

> A month later the aggravated robbery charge, I did not rob.  The person that I was with at the time robbed him.
>
> The police arrested me because he said I have a history of robbery. . . .  Made bond on that charge, caught the aggravated assault, come to jail.  Long story short I did not know what to do or who to talk to about having to defend myself against those charges and I was convinced at that age that it would be in my best interest to plead guilty to those charges, be looking at sixty-five years.
>
> So I had to do the math, what I want to do fifteen years or sixty-five years.  I chose the fifteen.  But the reason why I shot this guy was really like a neighborhood, you know, this is in '91 and it's before all the gang explosion in Memphis, you represented your neighborhood, you know.

The Defendant spent fourteen years of his fifteen-year sentence confined.  He stated that he had to serve approximately 95% of his sentence because he "started acting a fool."  He was released in February 2006 from prison.

While in prison, he learned the trade of plumbing and worked as a "journeyman," a plumber's "helper," when he was released.  At some point between April 2006 and July 2007 the Defendant got a gun "[f]rom the streets."  He knew that he was not supposed to have it because he was a convicted felon.  He also knew that if he was "caught with that gun [he was] looking because of [his] record [at] fifteen to life."  He stated, "[T]hat's the chance I was willing to take because I felt like checking my life was more important than . . . taking a chance of going to jail."

The Defendant then maintained that he shot victim Terrance because "[he] reacted to [victim Terrance] opening his gun and shooting it."  He acknowledged that because he fired four shots he could have killed three other people.  He stated, however, that "when you act under fire you don't think about maybe I might hit these other people out here.  What you're thinking about is this person is trying to take your life."  He also stated, "So, it's either me or him, you know.  My consideration was not for the people that was around us, acting for my own life which was being threatened by this gun that [victim Terrance] is firing at me."

The Defendant stated that it "was very unfortunate for everyone involved, . . . everybody lost in this."  He also stated, "[I]t's sad to say that it was good that I actually had a gun at that particular time.  My intentions was [sic] not to kill anyone.  My intentions was

-28-

[sic] not to harm anyone else that was hurt during that time. My intention was to basically defend myself."

The trial court found that the Defendant was a Range II offender. The trial court found the following enhancement factors applicable to each conviction: (1) the Defendant has a "previous history of criminal convictions [and] criminal behavior, in addition to those necessary to establish [his Range II status]"; (2) the Defendant "possessed or employed a firearm[] . . . during the commission of the offense"; (3) the "felony resulted in death or serious bodily injury, or involved the threat of death or serious bodily injury, to another person, and the [D]efendant has previously been convicted of a felony that resulted in death or serious bodily injury"; and (4) the Defendant "was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." See Tenn. Code Ann. § 40-35-114 (2006). As to count six only, the trial court also found that the victim, Erma Grice, "was particularly vulnerable because of age." See Id. The trial court placed "great weight" on the second and third factors listed above. With regard to the Defendant possessing or employing a firearm, the trial court additionally noted that even though he was a prior convicted felon, he obtained a gun after being released from prison. The trial court did not give "very much weight" to the enhancement factor that the Defendant was adjudicated to have committed a delinquent acts which would constitute felonies. The court also noted that "this was not a self-defense case at all."

In terms of mitigating factors, based on the proof submitted, the trial court rejected that the Defendant "had a strong reason to do it. . . . Basically he's motivated by a desire to provide necessities for his family, namely safety." The trial court stated that there "just was no need for him to shoot into this crowd of people, just no need at all. This was not a situation where someone was in immediate danger or he was in immediate danger."

Accordingly, on count one, second degree murder, the trial court sentenced the Defendant to thirty-five years as a violent offender. As to counts two, four, and seven, attempted voluntary manslaughter, the trial court sentenced the Defendant to seven years each. As to count three, attempted second degree murder involving victim Carolyn Williams, the trial court sentenced the Defendant to eighteen years. As to count six, attempted second degree murder involving victim Erma Grice, the trial court sentenced the Defendant to twenty years based on the additional enhancement factor that she was particularly vulnerable.

Next, the trial court found that the Defendant was an offender whose record of criminal activity was extensive. The trial court further found that the Defendant "is a dangerous offender" and that "his behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." It noted that he "could have killed five or six people." Moreover, the trial court found that "the circumstances surrounding the commission of the offense [were] aggravated" and that

"confinement for an extended period of time is necessary to protect society from his own [un]willingness to lead a productive life, and the [D]efendant's resort to criminal activity in furtherance of his anti-societal lifestyle."

Accordingly, the trial court ordered that each count run consecutively to one another, for a total effective sentence of ninety-four years to be served in the Department of Correction. The trial court found that, based on "the circumstances with his whole life tending toward violence," "the aggregate length of these sentences . . . reasonably relates to the offense[s] that he stands convicted of."

The Defendant filed a motion for a new trial arguing that the evidence was insufficient to sustain each of his convictions and that the trial court erred "by failing to suppress photo spread identifications of [the Defendant] by several individuals." The trial court denied the motion, and the Defendant appealed. On appeal, the Defendant argues that the trial court erred in failing to set aside the jury verdict based upon him shooting in self-defense and that the trial court erred in sentencing him.

## Analysis

### Sufficiency of the Evidence

The Defendant first challenges the sufficiency of the evidence supporting his convictions, contending that "there is insufficient proof that [the Defendant] shot in any manner other than in self defense."

Our Rules of Appellate Procedure provide that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

An appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest

legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

*Self-Defense*

At the time of the incident in this case, the relevant Tennessee statute on self-defense provided that a person was justified in "using force intended or likely to cause death or serious bodily injury" if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (Supp. 2007). When a defendant relies upon a theory of self-defense, the State bears the burden of proving that the Defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). It is well-settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within a jury's prerogative to reject a claim of self-defense. Goode, 956 S.W.2d at 527.

The Defendant claimed at trial that he acted in self-defense. The jury's verdict, however, clearly discredited the Defendant's testimony and resolved the facts in favor of the State.[10]

Although the Defendant claimed that he went back to the scene because he thought that his sister, Rashada, "was being jumped on," the proof established that the fight between Rashada and Kendra had ended before the Defendant returned. Rashada testified that she began walking towards her apartment after the fight. Moreover, the Defendant testified that he came from the direction of Rashada's apartment toward the "crowd" looking for Rashada. Although Rashada saw the Defendant "walking up" toward victim Terrance as she was leaving, the Defendant claimed that he did not see her. The shooting then occurred shortly thereafter.

Moreover, numerous witnesses for the State, including Carolyn Williams, Latesha Harris Boyd, Latarsha Harris, Damarius Harris, Roger Boyd, Larry Pillowe, and Anthony Mears, testified that they saw the Defendant approach victim Terrance and shoot him. Erma Grice ran before victim Terrance was shot. She testified, however, that the Defendant "came up, [] reached down in his pants and pulled up [a] gun and was just waving it." She stated that the Defendant then "shot [her] on [her] left side." Jessica Carr testified that she saw the Defendant walk up to victim Terrance and "right when [the Defendant] walked closer to him . . . that is when he like, pulled up the gun and started shooting." Although she acknowledged that she did not actually see the Defendant's gun, immediately after she saw the Defendant "like . . . pull up on his shirt," she heard gunshots. Kendra McMullen testified that she was walking away from victim Terrance when she heard gunshots. However, she turned around and saw the Defendant "shooting in the crowd."

Additionally, numerous witnesses for the State, including Latesha Harris Boyd, Latarsha Harris, Roger Boyd, and Kendra McMullen, also testified that they knew that victim Terrance did not have a gun that night. Several other witnesses, including Erma Grice, Jessica Carr, Damarius Harris, and Sanverneado Pleas, testified that they did not see victim Terrance with a gun that night. Numerous witnesses also testified that victim Terrance did not threaten the Defendant in any way or act aggressive toward him.

Accordingly, we conclude that the State adduced sufficient proof for the jury to reject the Defendant's claim of self-defense. For these reasons, the jury had sufficient evidence upon which to reject the Defendant's claim that he shot in self-defense, and we will not

---

[10] Although the Defendant challenges the sufficiency of the evidence for each of his convictions, the sole challenge actually advanced by the Defendant is that there was insufficient evidence to prove that he did not act in self-defense on each of his convictions. Therefore, we limit our analysis to the sufficiency of the evidence on the self-defense issue. The same analysis on the self-defense issue applies to all convictions.

disturb its verdict on appeal. See Winters, 137 S.W.3d at 655. Thus, the Defendant is entitled to no relief on this issue.

## Sentencing

The Defendant also challenged his sentence, contending that the trial court imposed an excessive sentence and that the trial court erred in imposing consecutive sentencing. When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). "[A] trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Id. at 709. This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)

Prior to imposing a sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2006).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (Supp. 2007). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2006).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2006).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann.§ 40-35-103(1) (2006).

*Excessive Sentences*

In addition to contesting the consecutive nature of his sentences which we address below, the Defendant argues that his sentence is excessive. In arguing that his sentence is excessive, the Defendant claims that the trial court failed to consider the sentencing guidelines codified at Tennessee Code Annotated sections 40-35-103 and 40-35-210. The Defendant also claims that the trial court failed to consider all of the information provided in the presentence report and that it "did not base its decision on the evidence at trial – which showed that [the Defendant] feared that his younger sister was being threatened by another man."

The Defendant was convicted of one count of second degree murder, a Class A felony;[11] two counts of attempted second degree murder, Class B felonies;[12] and three counts of attempted voluntary manslaughter, Class D felonies.[13] The Range II sentence for a Class A felony is twenty-five to forty years; the Range II sentence for a Class B felony is twelve to twenty years; and the Range II sentence for a Class D felony is four to eight years. See Tenn. Code Ann. § 40-35-112 (2006). The trial court sentenced the Defendant to thirty-five years on his second degree murder conviction; eighteen years on his attempted second degree murder conviction involving victim Carolyn Williams; twenty years on his attempted second degree murder conviction involving victim Erma Grice; and seven years on each of his attempted voluntary manslaughter convictions. Each sentence is within the authorized term for the respective class, and only his twenty-year sentence for the attempted second degree murder of Erma Grice is at the top of the range.

In asserting that his sentence is excessive, the Defendant does not contest the trial court's application of any one of the enhancement factors. Thus, we will not address the trial court's findings in that regard. Instead, the Defendant claims that the trial court failed to consider the sentencing guidelines codified at Tennessee Code Annotated sections 40-35-103 and 40-35-210; failed to consider the information provided in the presentence report; and failed to consider the evidence at trial. We disagree. To the contrary, our review of the sentencing hearing transcript indicates that the trial court carefully considered all appropriate factors and determined the length of each sentence in a manner consistent with the purposes,

---

[11] See Tenn. Code Ann. § 39-13-202 (Supp. 2007).

[12] See Tenn. Code Ann. § 39-13-210 (2006).

[13] See Tenn. Code Ann. § 39-13-211 (2006).

principles, and goals of the Sentencing Act. Thus, the Defendant is entitled to no relief on this basis.

*Consecutive Sentencing*

The Defendant also contests the trial court's finding that he serve his sentences consecutively. As discussed above, our supreme court recently has directed that we review felony sentences imposed pursuant to the 2005 amendments to the 1989 Sentencing Act "under an abuse of discretion standard with a 'presumption of reasonableness.'" Bise, 380 S.W.3d at 708. We recognize that the effective sentence at issue in Bise was the result of several sentences ordered to be served concurrently. Id. at 687 n.5. The supreme court has not yet addressed directly what impact, if any, its decision in Bise has on our review of consecutive sentences. However, in State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012), in which the supreme court expressly extended the Bise standard of review to questions related to probation or any other alternative sentences, the court also cited with approval the case of State v. Henry Floyd Sanders, No. M2011-00962-CCA-R3-CD, 2012 WL 4841545 (Tenn. Crim. App. Oct. 9, 2012), perm. app. granted (Tenn. Feb. 15, 2013). Caudle, 388 S.W.3d at 278. Sanders cited to the Bise language in stating the applicable standard of review on the issue of consecutive sentencing. Henry Floyd Sanders, 2012 WL 4841545, at *15. Additionally, the supreme court recently granted the State's application for permission to appeal in State v. James Allen Pollard, No. M2011-00332-CCA-R3-CD, 2012 WL 4142253 (Tenn. Crim. App. Sept. 17, 2012), perm. app. granted (Tenn. Feb. 13, 2013). In Pollard, a panel of this Court reversed a trial court's imposition of consecutive sentencing and remanded the case to the trial court for further findings. Id. at *21.[14]

Moreover, in Bise, our supreme court stated that "when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the 'presumption of correctness' ceased to be relevant." 380 S.W.3d at 708. We note that the relevant Tennessee statute allows appellate review of the following within the context of sentencing: "the length, range or the manner of service of the sentence" as well as "the imposition of consecutive sentences." Tenn. Code Ann. § 40-35-401(a) (Supp. 2005). Therefore, all other components of the "imposition of sentences" are reviewed under this abuse of discretion standard, Bise, 380 S.W.3d at 708, and we see no reason for the imposition of consecutive sentencing to be treated differently. Thus, based upon Bise and

---

[14] We further note that a panel of this Court also expressly extended the Bise standard of review to misdemeanor sentencing. See State v. Michael Snodgrass, No. E2011-02637-CCA-R3-CD, 2013 WL 785057, at *5 (Tenn. Crim. App. Mar. 1, 2013).

<u>Caudle</u>, we conclude that the abuse of discretion standard with a presumption of reasonableness applies to appellate review of consecutive sentencing.[15]

Tennessee Code Annotated section 40-35-115 (2006) provides, in pertinent part, that a trial court may impose consecutive sentences if it finds by a preponderance of the evidence that one of the following criteria are met: "(2) [t]he defendant is an offender whose record of criminal activity is extensive; . . . [or] (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4), (6). In addition to these criteria, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary. <u>State v. Imfeld</u>, 70 S.W.3d 698, 708 (Tenn. 2002); <u>see also</u> Tenn. Code Ann. §§ 40-35-102(1) (Supp. 2005), -103(2) (2003); <u>In re Sneed</u>, 302 S.W.3d 825, 828-29 (Tenn. 2010).

In analyzing whether consecutive sentences were appropriate for the remaining convictions, the trial court found that, pursuant to Tennessee Code Annotated section 40-35-115, the Defendant "is an offender whose record of criminal activity is extensive" and the Defendant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" <u>See</u> Tenn. Code Ann. § 40-35-115 (1), (4). It noted specifically that he "could have killed five or six people." Moreover, the trial court found that "the circumstances surrounding the commission of the offense [were] aggravated."

The trial court's findings regarding consecutive sentencing are supported by the record. The Defendant's prior adult criminal record consists of three felonies, for which he served fifteen years in prison. The Defendant committed these three felonies when he was seventeen years old and only was released sixteen months prior to committing the offenses in this case. When determining whether sentences should run consecutively or concurrently, trial courts are not limited to considering the defendant's criminal activity or conduct that occurred after the defendant's eighteenth birthday. <u>See</u> <u>State v. Banks</u>, 271 S.W.3d 90, 147 (Tenn. 2008); <u>see also</u> <u>State v. Adams</u>, 973 S.W.2d 224, 231. Accordingly, the Defendant's juvenile criminal record also is relevant, and it consists of numerous adjudications, including, <u>inter alia</u>: grand larceny of an automobile; theft of property; theft of a vehicle between $1,000 and $9,999; evading arrest; no driver's licence; and possession of cocaine with intent.

---

[15] We acknowledge that other panels of this Court have held otherwise. <u>See</u>, <u>e.g.</u>, <u>State v. Ricky Earl Genes</u>, No. M2012-02284-CCA-R3-CD, 2013 WL 1395290, at *6 (Tenn. Crim. App. Apr. 8, 2013).

Although consecutive sentences may be based solely upon a finding of a record of extensive criminal activity, see, e.g., Adams, 973 S.W.2d at 231, we also agree with the trial court that the Defendant satisfies the definition of a dangerous offender. The instant offenses resulted in victim Terrance being killed and bystanders being shot. The trial court noted that the Defendant potentially could have killed up to five or six people. Moreover, at the sentencing hearing, the Defendant admitted that he knew he legally was not permitted to possess a weapon because he was a convicted felon. He further admitted to obtaining a gun at some point between April 2006 and July 2007 "[f]rom the streets." The Defendant also testified that when he shot his weapon that night, his "consideration was not for the people that was [sic] around" him, even though the proof established that numerous bystanders, including children, were in the area. Clearly, the Defendant engaged in behavior showing "no hesitation about committing crimes in which the risk to human life is high" and little or no regard for human life. Furthermore, we also point out that the Defendant attempted to justify his prior especially aggravated robbery conviction by stating, "Well, actually I did not rob the person. . . . I just shot him. . . . But the reason why I shot this guy was really like a neighborhood, you know, . . . you represented your neighborhood."

The record also supports the trial court's findings that "confinement for an extended period of time is necessary to protect" the public against further criminal conduct by this Defendant. See State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).[16] The Defendant was released from prison after serving fifteen years of a sixteen-year sentence, which he began serving when he was seventeen years old, just sixteen months prior to committing the offenses in this case. Moreover, as found by the trial court, "the aggregate length of these sentences . . . reasonably relates to the offense[s] that he stands convicted of." See id. Accordingly, we find no error in the trial court's imposition of consecutive sentences on the additional basis that the Defendant is a dangerous offender.

Lastly, the Defendant asserts that the trial court failed to consider the Defendant's "potential for rehabilitation" in imposing consecutive sentences. This contention also is without merit. In sentencing the Defendant, the trial court clearly concluded that the Defendant was a poor candidate for rehabilitative efforts. It noted the Defendant's "[un]willingness to lead a productive life," that the Defendant had "been in prison most of his life," and that he had resorted to criminal activity "in furtherance of his anti-societal lifestyle."

---

[16] Because we find that the Bise standard applies to the review of consecutive sentencing, we are led to question the continuing vitality of the requirements for additional findings mandated by Wilkerson, 905 S.W.2d at 939, when a trial court imposes consecutive sentences based on the dangerous offender factor. We, however, conclude that we need not resolve the issue of whether additional findings are still required because the result in this case would be the same. Here, the trial court made those additional findings.

Accordingly, the trial court imposed these sentences in a manner consistent with the purposes, principles, and goals of the Sentencing Act. Moreover, we also conclude that the record supports the consecutive sentences imposed by the trial court even under the pre-Bise standard of review. Thus, the Defendant is entitled to no relief on this issue.

## CONCLUSION

For the reasons set forth above, we affirm the judgments of the trial court.


_____
JEFFREY S. BIVINS, JUDGE